
IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs January 4, 2017

## STATE OF TENNESSEE v. JUAN CERANO

**Appeal from the Criminal Court for Shelby County**
**No. 14-01165      John Wheeler Campbell, Judge**

_____

### No. W2015-02234-CCA-R3-CD

_____

The Defendant, Juan Cerano, was convicted of rape of a child and aggravated sexual battery. The trial court merged the aggravated sexual battery conviction into the rape of a child conviction and sentenced the Defendant to thirty years in prison. On appeal, he contends that the trial court erred by denying his motion to produce records from the Department of Children's Services regarding prior allegations of abuse after an in camera inspection. After reviewing the record, the briefs of the parties, and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

Robert Amann (on appeal and at trial) and Laura English (at trial), Memphis, Tennessee, for the appellant, Juan Cerano.

Herbert H. Slatery III, Attorney General and Reporter; Lacy Wilber, Senior Counsel; Amy P. Weirich, District Attorney General; and Jessica Banti, Leslie Fouche, and Terre Fratesi, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL AND PROCEDURAL HISTORY

On March 6, 2014, the Defendant was indicted for rape of a child and aggravated sexual battery. On August 11, 2014, the Defendant filed a motion for the production of Department of Children's Services ("DCS") records regarding prior allegations of abuse

involving the victim for in camera inspection, arguing that "[t]he evidence in the DCS file could show that 1) [the victim's mother] has always been considered an unfit parent and 2) that [the victim's mother] has made several accusations against [the Defendant] that have been unfounded." On August 20, 2014, the Defendant filed a "memorandum to support motion to allow DCS records and medical records to be admissible." In the memorandum, the Defendant argued issues relating to admissibility and production, contending that he should "be allowed access to *all* relevant DCS records." Both the motion and memorandum, however, include attached exhibits that appear to be at least some of the victim's DCS and medical records. We glean from the record that on August 22, 2014, the trial court denied the Defendant's motion after an in camera inspection of the DCS records. The record does not include a transcript of the hearing on the Defendant's motion or the trial court's order denying the motion.

Before the trial and outside of the presence of the jury, the State and trial court discussed the Defendant's request to produce the DCS records. The State said, "Your Honor ruled [at a previous hearing] that the mention by the victim, that his mother had told him to lie and he had lied previously, could be used only to rebut his credibility. That the total of the DCS records and what else occurred is not admissible...." The trial court responded, "Right.... [A]ny admission [the victim] made of not saying something that's truthful, that's fair game as far as I was concerned." The trial court noted that "other issues involving other people" were not relevant, unless those witnesses testified.

At trial, the victim, the Defendant's son, testified that he was born on January 25, 2002, and was thirteen years old at the time of trial. He stated that during the summer of 2013, he spent weekdays with his mother and weekends with the Defendant. He recalled that on the last weekend of the summer of 2013, the Defendant took him and his brother, J.C.,[1] to the Defendant's house in Memphis, Tennessee, which the Defendant shared with the victim's aunt and cousins. The victim testified that the Defendant's house had two bedrooms and that he slept in one of the bedrooms with J.C. and his three cousins. The victim explained that later in the evening, the Defendant and others were on the front porch of the house drinking beer and ingesting cocaine. The victim walked onto the porch but was told to go back inside. He went back into the house to watch television with J.C. and his cousins in the bedroom, and they fell asleep in the bedroom.

The victim stated that the Defendant woke him up in the middle of the night while everyone else was sleeping. The victim explained that when the Defendant woke him up, the Defendant did not say anything to him but signaled to the victim to go into the living room. The victim stated that he was wearing a t-shirt and shorts and that the Defendant was dressed in a button-up shirt and jeans. The victim testified that once they were in the

---

[1] It is the policy of this court to refer to minors by their initials.

living room, the Defendant "told [him] to pull down [his] pants and bend over the couch." The victim stated that he began to cry and told the Defendant he did not want to comply. The victim described the Defendant as "acting mean" and drunk. He testified that the Defendant then "pulled down [his] pants and pushed [him] to the couch." The victim stated that when he landed on the couch bent over, the Defendant grabbed him by the waist and inserted his penis into the victim's anus. The victim described the Defendant's actions as "very painful." The victim stated that the Defendant inserted his penis multiple times into his anus. The victim testified that he did not look back at the Defendant but looked at the couch and cried.

The victim testified that after the Defendant stopped, the Defendant hit him with a belt "everywhere." The victim explained that he did not scream or yell because he was afraid. The victim stated that the Defendant told him to go back to the bedroom and that he complied and went to back to sleep.

The victim testified that on the following day, his anus hurt and that it was very painful to use the restroom and to sit down. He stated that the Defendant hit him again that evening as well. The victim played with J.C. and his cousins for the rest of the weekend. After returning to his mother's house on Sunday, June 24, 2013, the victim told his mother what the Defendant had done to him, and she took him to the LeBonheur Children's Hospital. While at the hospital, the victim spoke with a police officer about the rape. He informed the nurse who examined him about the rape, and she took photographs of him. The victim stated that a few days after the hospital examination, he spoke with Ms. Teresa Onry at the Child Advocacy Center, and he told her about the rape and the Defendant's drug use.

The victim testified that although the Defendant "rocked [him] hard" to wake him on the night of the rape, the other child in the same bed as him did not wake up. The victim seemed to suggest that J.C., who was seven years old at the time, was the other person in the bed with him on the night of the rape. The victim stated that before the Defendant pulled his clothes down, he was not wearing underwear. He did not remember testifying at the preliminary hearing that he was wearing underwear and shorts. He also could not recall testifying at the preliminary hearing that the Defendant "yanked" off his shorts but "pulled" off his underwear. The victim did not remember telling the forensic interviewer that he could not recall what the Defendant was wearing the night of the rape. The victim testified that the Defendant threatened to hit him if he told anyone about the rape. The victim also testified that after the Defendant raped him, the Defendant hit him "really hard" with a belt, describing the pain on a scale of one to ten as an eight. The victim stated that the following day after the rape, he was able to walk, run a little bit, and play, but he could not play soccer.

- 3 -

The victim denied ever lying about the abuse to get the Defendant in trouble so that he could live with his mother. He admitted, however, that he had told a DCS worker that his mother wanted him to say bad things about the Defendant so that she could obtain custody of him. Defense counsel asked the victim, "[H]ave you ever told a DCS worker that you want to stay with your mother, so to do that, you tell the DCS worker what your mom wants you to tell them?" The victim responded, "Yes, sir. But I say that because he tells me to say that. He threatens me to say that."

The victim conceded that he could not remember testifying at the preliminary hearing that he did not see the Defendant doing drugs but that he saw people putting "white thingies" in their noses. He maintained, however, that the Defendant was ingesting cocaine on the porch. He also conceded that on the day before his trial testimony, he "saw the video of [his] interview with the forensic interviewer," where he stated that the Defendant was doing drugs.

On re-direct examination, the victim confirmed that at the preliminary hearing, he testified that the Defendant had inserted his penis into the victim's anus after waking him in the middle of the night, removing his clothes, and bending him over the couch.

Officer Michael Smith with the Memphis Police Department was the responding officer who spoke with the victim at the hospital on June 24, 2013, around 1:40 a.m. He testified that upon encountering the victim, he found the victim and his mother to be "[s]cared," "[r]eally reluctant," and "[q]uite apprehensive to talk to [him]." Officer Smith stated that he determined that the victim was raped on June 21, 2013. After his interview with the victim and his mother, he took them to the Memphis Sexual Assault Resource Center (MSARC) where a nurse conducted a rape kit on the victim.

Ms. Teresa Onry, a forensic interviewer with the Memphis Child Advocacy Center who interviewed the victim, testified that the victim made a disclosure of physical and sexual abuse. On cross-examination, she stated that it was her job not to investigate the truth of a victim's statement, but only "to give the child an opportunity to say whatever is on [his or her] mind."

Sergeant Marlon Wright with the Special Victim's Unit of the Memphis Police Department, responded to LeBonheur Children's Hospital on June 24, 2013, and spoke with the victim's mother and Officer Smith. After arriving at MSARC, he spoke with the victim and the clinician. He testified that during his investigation, he gathered medical records and submitted the rape kit to the Tennessee Bureau of Investigation (TBI). He did not believe any DNA was recovered during the investigation.

- 4 -

Ms. Amanda Taylor, a sexual assault nurse examiner and an expert witness in sexual assault and forensic examination, testified that on June 24, 2013, she performed an examination on the victim at MSARC. Ms. Taylor stated that she found a perianal laceration on the victim, explaining that the perianal area was "going into the anus on the inside" and that the laceration was caused by blunt force trauma. She collected the victim's medical history for the purpose of making her report by speaking with the victim and his mother. Ms. Taylor testified that before going to the hospital, the victim told his mother that "his butt was hurting." She also testified that the victim's mother thought that the victim had constipation, gave the victim pain reliever, and then brought the victim to the hospital after he stated that he needed to go to the hospital. Ms. Taylor said that at the hospital, the victim told his mother that he had been penetrated by the Defendant. Ms. Taylor stated that during her interview, the victim informed her that "he had just had a bowel movement" and did not complain of constipation. She also stated that she did not find bleeding, explaining that it was not unusual for blood not to be present because the perianal tissue heals quickly and the laceration was not deep enough. She testified that the rape kit that she collected could have contained DNA from the Defendant but she did not necessarily expect DNA to be present. She concluded, to a reasonable degree of medical certainty, that the injuries reported by the victim were consistent with a sexual assault.

On cross-examination, Ms. Taylor testified that the victim told his mother about the Defendant's actions after his mother asked him whether anyone had done something to him. Ms. Taylor also testified that she did not detect damage to the inside of the victim's anus, explaining that she dilated the anus and could "see just inside" the anus but did not conduct further tests inside the anal cavity, such as a colonoscopy. She admitted that there are certain types of conditions that can mimic sexual abuse, including anal fissures, but stated that the victim's injury was consistent with a penetrating injury. She concluded that "more likely than not" this injury resulted from anal rape because of what the victim told her and the lack of reported history of constipation, diarrhea, or other gastrointestinal issues. She explained that she did not have a reason to believe that the victim was lying to her. She testified that upon examination, she did not find rectal prolapse, anal gaping, thickened anal folds, or venous congestion of the perianal tissues but acknowledged that the aforementioned conditions can be consistent with anal rape. She also testified that during her examination, she did not find any hair and did not have a way of determining whether semen was present. Ms. Taylor testified that DNA can be found "at least up to five days out" from a rape and that her examination took place within five days of the rape. She also testified that although she did not have the results of the DNA sampling, she did conduct a "DNA kit." She stated that she did not find any other injuries, such as "whip marks" on the victim's back or buttocks.

On re-direct examination, Ms. Taylor explained that an anal fissure is usually bigger than a laceration and often goes deeper into the mucosal tissue. She also explained that it was possible that any DNA that belonged to the Defendant could have been expelled when the victim had a bowel movement before examination. She testified that most people who are sexually assaulted do not have associated physical injuries.

Dr. Karen Lakin, the medical director for the LeBonheur Cares Program, an assistant professor of pediatrics for the University of Tennessee, and a general pediatrician, was accepted as an expert in child abuse pediatrics. She testified that although she did not see the victim herself after the rape, she reviewed the Ms. Taylor's report on the victim, including photographs taken of the anal laceration. Dr. Lakin confirmed that the victim's injury was consistent with anal penetration and that the injury would not incapacitate him. She stated that she expected that it would be very difficult to obtain DNA from the perpetrator of a sexual assault after two days of normal daily habits, including bathing and regular bowel movements. Dr. Lakin testified that she believed that the victim's injuries were consistent with an "attempted insertion into the anal canal."

On cross-examination, defense counsel asked Dr. Lakin, "you said that you did see [the victim] previous to this, is that correct?" The State objected. During a bench conference, the State argued that defense counsel's question was leading to testimony about prior physical abuse. Defense counsel responded by stating that Dr. Lakin had opened the door to questioning on the matter, arguing that Dr. Lakin said she had previously seen the victim before June of 2013. The trial court sustained the State's objection, reasoning that Dr. Lakin merely said that she had not seen him in June of 2013.

Dr. Lakin testified that she did not believe the victim's injuries would be consistent with those caused by constipation. She noted that constipation could lead to anal fissure and damage to the mucosa, whereas penetrating injuries, such as sexual assault, could lead to anal laceration and damage to the epidermis. She stated that anal sex can damage the inside of the anus and that constipation can damage the anal verge. She also stated that the victim's laceration was at the anal verge.

The State rested its case-in-chief. Defense counsel asked the trial court to reconsider its previous ruling to not allow the introduction of medical and DCS records, stating that the Defendant should be able to bring up a 2007 instance of physical abuse by the victim's mother against the victim that resulted in her loss of custody. The State argued that the past instance of abuse was not relevant and was improper for impeaching the mother because she was not testifying at trial. The State noted that "the other two previous times that the victim was hospitalized at the hands of [the Defendant]" were likewise irrelevant to the instant allegation of abuse. After hearing arguments, the trial

court ruled that the 2007 instance of physical abuse by the victim's mother was irrelevant, noting its only purpose would be to impeach the credibility of the mother, which was not an issue before the jury. The trial court also stated that the Defendant could address the fact that the victim and his mother "had some rough times" but not "specific details about alleged abuse."

The Defendant testified that he and the victim's mother separated when the victim was about two years old. He explained that their relationship became strained after her cancer diagnosis. He stated he told the victim's mother that he would leave and take their son with him. He also stated that she acquiesced in him taking the victim and did not make any effort to contact him or the victim for the following year. He testified that after six months of separation, he received a letter from a hospital stating that the victim's mother was pregnant. He then filed for divorce and sought custody of the victim. In March of 2007, the victim's mother gained primary parent status after the custody hearing. In October of 2007, the Defendant gained custody of both the victim and J.C., the victim's younger brother.

The Defendant explained that after he gained custody, the victim's mother "was very disturbed and upset" and told him that he "was going to regret what [he] had done." He testified that eventually the victim's mother gained visitation rights but that the relationship between the victim's mother and the Defendant did not improve. The Defendant was the primary custodial parent from October 2007 until June 21, 2013. The victim's mother functioned as the primary caregiver during the summer months, but he retained weekend visitation throughout the summer.

The Defendant testified that on Friday, June 21, 2013, he picked up the victim and J.C. from their mother. He also testified that before going to his house, he went to McDonald's and purchased chicken nuggets and spicy chicken sandwiches for J.C. and the victim. The Defendant stated that they did not get to his house until after midnight and that he, the victim, J.C., and his sister had tamales upon arrival. At the time, seven people usually lived at his house: the Defendant, J.C., the victim, the Defendant's sister, her son, and her two daughters. The Defendant stated that after they finished eating, he sent J.C. and the victim to bed. He explained that the bedroom where his children and some of his sister's children slept was small and had multiple beds, including a bunk bed. He testified that on June 21, 2013, the victim slept on the top bunk, J.C. slept on the bottom bunk, and one of his nieces slept in a twin bed in the same bedroom. He also testified that his sister and other niece slept in the adjacent room, explaining that only one wall separated the bedrooms and that you could hear "normal conversations" going on in the adjacent room. The Defendant slept in the living room on the floor.

The Defendant testified that on June 21, 2013, the children went to bed around 1:00 a.m. and that nothing else occurred that night. He also testified that the following morning, he made breakfast, watched television, played, ate lunch, and then went to the park to play soccer. He stated that on the way to the park, he stopped at a gas station to purchase "Takis," which he described as a ten on a scale of one to ten for spiciness. He said the victim "ate quite a few" of the "Takis." The Defendant testified that after they went to the park, they went back home, watched some movies, and went to bed. He also testified that on the following day, which was Sunday, June 23, 2013, they went to eat Chinese food after church. He stated that the victim ate at the Chinese buffet and that he enjoyed spicy food. The Defendant later dropped J.C. and the victim off at their mother's house and subsequently learned that the victim claimed that he raped him. The rape accusation led to the Defendant losing custody of J.C. and the victim.

On cross-examination, the Defendant testified that whenever he ate spicy food, he would eat a large amount of it and afterwards it would be "hard to go to the bathroom." He admitted, however, that he had not experienced so much pain from spicy food that he could not sit down.

Ms. Yesenia Cerano, the Defendant's sister and the victim's aunt, testified that one can hear conversations and a television through the separating wall between the two bedrooms in her home. She also testified that the victim slept on the top bunk in the room where J.C. and two of her children also slept. She stated that, from her bedroom, she can hear "everything that goes on in the living room." Ms. Cerano testified that on June 21, 2013, she and the Defendant sent the children, including the victim, to bed after eating tamales around midnight. She also testified that she and the Defendant stayed up and watched movies in the living room until about 2:00 a.m. She stated that she did not "hear anything go on that night." She explained that there was a steel grate between her bedroom and the children's bedroom in the hallway that made noise when someone would walk over it.

Ms. Cerano testified that the following morning, they woke up, had breakfast and lunch, and then went to the park. She also testified that while at the park, she took pictures of the victim playing soccer, which were entered into evidence as exhibits. Ms. Cerano stated that after the park, they went to a gas station to purchase "Takis" and that the victim ate most of the "Takis." The following day, on June 23, 2013, the Defendant, J.C., and the victim went to church. Ms. Cerano testified that after church, she met them at the Chinese buffet and then went home where the children played in a plastic pool. She took pictures of her daughter and the victim playing in the pool. She maintained that she would not lie to protect the Defendant and that she did not see anything suspicious.

On cross-examination, Ms. Cerano testified that she did not come forward with her account of the events following the allegations because no one had questioned her from the police department. She explained that the photographs that were entered into evidence of the victim that she took did not have the time and date printed on them because her cellular phone was not set up to do so.

On re-direct examination, the State was given an opportunity to review Ms. Cerano's cellular phone. Ms. Cerano then reviewed the pictures on her cellular phone and testified that the pictures from the park and the pool were taken on the dates of June 22 and June 23, 2013, respectively.

The jury returned a verdict, finding the Defendant guilty of rape of a child and aggravated sexual battery. The trial court merged the aggravated sexual battery conviction into the rape of a child conviction and sentenced the Defendant to thirty years in prison.

## ANALYSIS

On appeal, the Defendant argues that the trial court's refusal to grant the Defendant's motion for production of DCS records of past allegations of abuse involving the victim for in camera inspection deprived him of his right to present a defense. The State contends that because the appellate record does not include the DCS records of past allegations of abuse, the record is insufficient for this court to disturb the trial court's ruling. The State also contends that even if the record is sufficient, the Defendant has failed to meet his burden under *State v. Brown*, 29 S.W.3d 427 (Tenn. 2000).

Defendants in criminal cases have the right to mount a defense in opposition to the charges against them. *See Chambers v. Mississippi*, 410 U.S. 284, 294 (1973). The right to call witnesses on their behalf is a key component of this right. *See id.* This right, however, is not absolute, "and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process," such as the consistent application of rules governing evidence and procedure. *Id.* at 295; *see also State v. Flood*, 219 S.W.3d 307, 316 (Tenn. 2007). Because "[r]ules of procedure and evidence are designed to assure fairness and reliability in the criminal trial process," if "the rules of procedure and evidence are not applied arbitrarily or disproportionately to defeat the purposes they are designed to serve, [they] do not violate a defendant's right to present a defense." *Flood*, 219 S.W.3d at 316. Courts generally afford "state and federal rulemakers ... broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *Id.* (quoting *United States v. Scheffer*, 523 U.S. 303, 308 (1998)). In deciding whether the exclusion of evidence pursuant to an evidentiary rule amounts to a constitutional violation of a defendant's right to present a defense, courts "should

consider whether: (1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting the exclusion of evidence is substantially important." *Brown,* 29 S.W.3d at 433-34.

The Defendant argues that although he was able to cross-examine the victim about whether his mother asked him to lie and make prior allegations of abuse to DCS prior to the instant rape, he should have also had the opportunity to introduce the records in their entirety and that failure to introduce the records deprived him of his right to present a defense. We note that although the victim testified that his mother instructed him to lie on prior occasions, the jury accredited his testimony that the sexual acts occurred in this case. The appealing party bears the burden of preparing a proper record for the consideration of the appellate court. *See State v. Ballard,* 855 S.W.2d 557, 560 (Tenn. 1993). This includes preparing "a transcript of such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b). Absent from the record are the DCS records themselves, the trial court's order on their production or admissibility, or the hearing where the trial court made its ruling. Additionally, we note that because the record does not contain the trial court's ruling on the motion, it is unclear to this court whether the records were produced at all. The record before us simply contains no basis to evaluate the Defendant's claim that the denial of his motion was error, and, accordingly, we presume that the rulings of the trial court were correct. *See State v. Richardson,* 875 S.W.2d 671, 674 (Tenn. Crim. App. 1993). Absent the DCS records and the trial court's ruling, we cannot determine what, if any, additional information could have been presented, whether the trial court's disallowance of the evidence violated the Defendant's right to present a defense, or whether any error was harmless beyond a reasonable doubt. *See State v. Rickey Alvis Bell, Jr.,* No. W2012-02017-SC-DDT-DD, __ S.W.3d __, 2015 WL 12582638, at *17 (Tenn. Sept. 10, 2015), ("Because of the trial court's violation of the Defendant's constitutional right to present a defense, the Defendant is entitled to a new trial unless we are convinced beyond a reasonable doubt, and on the basis of the entire record, that this error did not contribute to the jury's verdicts."), *cert. denied,* 136 S. Ct. 2006, 195 L. Ed. 2d 221 (2016).

## CONCLUSION

Based upon our review of the record and the applicable law, we affirm the judgments of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE